**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JOSEPH CHESS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 07 C 5333 |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On February 6, 2007, Joseph Chess, then an inmate at the Metropolitan Correctional Center Chicago ("MCC"), suffered second-degree burns when another inmate, Jerome Adams, threw a cup of scalding water onto Chess's face and then physically assaulted him by hitting him with the cup and punching him. In September of 2007 Chess brought this action to recover for the injuries he sustained as a result of the attack. Plaintiff asserts a claim for relief against the United States ("defendant" or "Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* ("FTCA"). Chess's second amended complaint asserts that the United States failed to properly screen Adams upon intake and also failed to monitor him afterward, both on and before February 6, 2007. Chess and the United States have brought cross-motions for summary judgment. For the reasons stated below, plaintiff's motion for summary

judgment is denied, and defendant's cross-motion for summary judgment is granted in part and denied in part.

I.

Joseph Chess entered the MCC in September of 2006. Chess was housed in general population unit 13 ("Unit 13"). Jerome Adams had entered the MCC as a pre-trial inmate in January 2006. He was supposed to stand trial for bank robbery the next month but was found incompetent. Adams was tranferred to the Federal Medical Center in Butner, North Carolina ("FMC Butner") for treatment and restoration of competency. During his treatment at FMC Butner, Adams was diagnosed with Schizoaffective Disorder, Bi-Poler Type. On September 13, 2006, Adams returned to the MCC after BOP medical staff at FMC Butner determined that he was stable, receiving medication, and competent to stand trial. When Adams returned to the MCC, he was housed in Unit 13.

On September 28, 2006, Adams requested protective custody because he felt threatened by other detainees. Adams was placed in administrative detention in the special housing unit ("SHU"). BOP staff later determined that Adams did not want to be in the general population unit because he did not like being around gang members, though no specific threat had been made against him. On November 3, 2006, Dr. John Pindelski, chief psychologist at MCC, met with Adams to discuss the need for Adams to return to the

2

general population.[1]  Adams reiterated his concern about gang
members and stated that he would refuse placement in the general
population.  During the meeting, Adams was insolent toward Dr.
Pindelski and refused to comply when Dr. Pindelski instructed him
to remain in his chair.  As a result, Adams was issued an
incident report for his conduct.  Adams was subsequently issued
another incident report for failing to comply with an order to
return to the general population on November 20, 2006.

Adams did return to the general population on December 4,
2006, and remained there until December 22, 2006.  On December
23, 2006, BOP psychologist Dr. Dan Greenstein entered a progress
note on Adams, stating that he had been placed in the SHU the
prior evening.  The progress note stated that the operations
lieutenant who moved Adams to the SHU reported that Adams
"appeared on the verge of striking out [at] him" and that the
reason for the SHU placement was "protection of inmate and of
staff."  Dr. Greenstein also noted that during the interview on
December 23, Adams "stared intensely at [him] in a menacing
manner" and "failed to reply about whether he has been medication
compliant."  The December 23 review was the last documented
review until February 16, 2007, after the attack on Chess.  On
December 28, 2006, Adams was returned to Unit 13.

---

[1]  This was not the first time Adams had undergone review by
the MCC psychology staff.  He was reviewed a number of times
while he was in the SHU.

At around 9:30 p.m. on February 6, 2007, Officer DePaul, the correctional officer assigned to Unit 13, began his lockup routine. This included DePaul telling the inmates to get their water and ice and instructing them to get ready for the lock-down. DePaul also collected his personal items and packed them away in his duffle bag. The call for the inmates to prepare for lock-down prompted Chess to go downstairs to collect the rags that he previously used to clean the dayroom. While Chess was descending the stairs, Adams threw a cup of scalding hot water in Chess's face, slammed the cup in Chess's face, and proceeded to punch Chess in the face repeatedly. After the attack was quelled, Chess was taken to Northwestern Hospital, where he was treated for second-degree burns to his face, neck, ear, and eye.

After the attack, DePaul was disciplined by the BOP for inattention to duty and received a five-day suspension.[2] Chess submitted an administrative tort claim to the BOP under the FTCA, but the claim was denied on July 2, 2007.


II.

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the

---

[2]  It is unclear from the record whether DePaul was disciplined for reading a newspaper approximately fifteen minutes before the attack, in violation of BOP regulations, or for packing his personal belongings during the lockup.

4

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On cross-motions for summary judgment, I construe all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re. United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)). Because the defendant has raised the discretionary function exception as a defense, I will start with a consideration of its motion.

A. Discretionary Function Exception

The United States argues that it is immune from suit because the discretionary function exception to the FTCA applies to this case. The United States typically enjoys sovereign immunity from suits for damages. The FTCA, however, waives this immunity in actions "for money damages ... for ... personal injury ... where the United States, if a private person, would be liable" under the applicable state tort law. 28 U.S.C. § 1346(b)(1); *Parrott v. United States*, 536 F.3d 629, 635 (7th Cir. 2008). Waiver under the FTCA is not absolute, and the discretionary function exception is one limit on the FTCA's waiver. *Calderon v. United*

5

*States*, 123 F.3d 947, 948 (7th Cir. 1997). Specifically, the discretionary function exception bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Calderon*, 123 F.3d at 949 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). "It is the Government's burden to assert [this] exception[] if and when it seeks to defeat a claim because of [it]." *Parrott*, 536 F.3d at 634-35.

Two factors must be present for the exception to apply: "(1) the action complained of must involve an element of judgment or choice; and (2) the action must relate to considerations of public policy." *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (citing *United States v. Gaubert*, 499 U.S. 315, 322-23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536-37, 108 S.Ct. 1945, 100 L.Ed.2d 531 (1988)).

6

The Government cannot satisfy the first prong if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because there is no "element of judgment or choice" involved. *Calderon*, 123 F.3d at 949 (quoting *Gaubert*, 499 U.S. at 322). With respect to the second prong, the decision at issue in the FTCA claim must involve a public policy concern, but the exception is not limited to decisions by those in "the policymaking or planning ranks of government." *Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003). Thus, even day-to-day discretionary decisions may satisfy the second prong if they are "susceptible to policy analysis." *Id.* Further, I must presume that an action is grounded in public policy "where the statute or regulations allow the government agent to exercise discretion." *Id.* at 950 (citing *Gaubert*, 499 U.S. at 323); *see also Palay*, 349 F.3d at 428.

The Government makes several arguments for why the discretionary function exception should apply in this case. First, it argues that under *Calderon*, Chess's claim that defendant violated its duty of care, as set forth in 18 U.S.C. § 4042, is barred. Section 4042 states that the BOP "shall ... provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). In *Calderon*, the Seventh Circuit found that while the duty to protect inmates under § 4042 is not

discretionary, that statute does not "direct the manner by which the BOP must fulfill this duty." 123 F.3d at 950. Because the plaintiff in that case could not dispute the fact that § 4042 "sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates," he was unable to get around the discretionary function exception based on invocation of that statute alone. *Id.*

The Seventh Circuit has since clarified its holding in *Calderon*. In *Palay*, the court revisited the duty to protect, noting that "[u]nstated but implicit in *Calderon* is the assumption that prison officials in that case had taken note of the threats against the plaintiff in that case and weighed the relevant considerations in deciding how best to act (or not) in response." *Palay*, 349 F.3d at 432. In other words, while § 4042 leaves room for discretionary actions, analysis under the second prong of the discretionary function exception test is still required. Furthermore, in *Calderon*, the court relied on the fact that the other statute invoked by the parties also fell within the discretionary function exception. 123 F.3d at 949-50. Therefore, in the case before me, the government's argument that it cannot be liable under § 4042 because of the Seventh Circuit's decision *Calderon* reaches too far. I am required to consider whether the challenged actions at issue here are based on policy considerations.

Where to house an inmate within an institution is a decision
that is subject to policy analysis. So, the Government would be
protected under the discretionary function exception where Chess
argues, generally, that the Government is liable because it
violated the broad duty articulated in § 4042. However, Chess's
argument is more nuanced. Namely, Chess alleges that the
Government is liable under § 4042 because it violated certain
non-discretionary BOP program statements. While I agree with the
Government that it cannot be liable generally under § 4042, it
may be liable under § 4042 in limited circumstances where the
Government has taken some non-discretionary action that causes it
to violate the mandate to protect inmates.

The Government argues that its decision to place Adams in
the general population was discretionary, thereby satisfying the
first prong of the discretionary function exception test. The
Government claims, and Chess does not dispute, that the
applicable regulations and directives reflect that federal
prisoners may be placed into administrative detention at the
discretion of the BOP. Indeed, the regulations state that "[t]he
Warden *may* ... place an inmate in administrative detention when
the inmate's continued presence in the general population poses a
serious threat to ... other inmates or to the security or orderly
running of the institution." 28 C.F.R. § 541.22 (2007) (emphasis
added); P.S. 5270.07 (utilizing the same language). The

9

permissive language in the statute suggests that placing a federal prisoner in administrative detention is a discretionary act, and, again, housing decisions are subject to policy analysis. Because administrative detention is not punitive in nature, P.S. 5270.07, the regulations may be viewed as governing housing decisions. However, whether a federal prisoner may be placed in administrative detention does not necessarily answer the question of whether he can be placed in the general population. It is the latter type of action, here, BOP's decision to place Adams in the general population, that Chess is challenging.

The Government also points to the BOP program statement governing initial housing assignments for pretrial inmates. The statement calls for "[t]horough screening and good professional judgment" in making housing assignments to "ensure pretrial inmates' safety and security." P.S. 7331.04. Again, the language here suggests, and in fact almost demands, that BOP officials engage in discretionary decision-making in assigning housing units. But the directive on pretrial inmates only tells part of the story, since, as Chess points out, P.S. 7331.04 contains several mandatory procedures and, further, is intended to supplement and not replace P.S. 5290, which is the directive governing screening of all newly arrived inmates. P.S. 7331.04

10

("Procedures specified in this section are to augment those in the Program Statement on Intake Screening").

In fact, Chess persuasively argues that the BOP officials handling Adams' intake failed to comply with at least one mandatory procedure in P.S. 5290, making the discretionary function exception inapplicable to his claim that the Government failed to properly screen Adams when he entered the MCC.  Chess claims that the BOP official conducting Adams' intake screening failed to review Adams' Inmate Central File as required.  The BOP directive states that the BOP "interviewer *shall* also review SENTRY information and the Inmate Central File *or* Presentence Investigation Report (PSI), *if available*, and make a decision whether the inmate is suitable for placement in general population."  P.S. 5290 (1999) (emphasis added).

The Government responds to this argument not by showing that it did comply with the directive, but by stating that Adams had no PSI and that Chess fails to cite any evidence tending to show that Adams' central file was in fact available.  However, because the discretionary function exception is the Government's defense to raise, it is not sufficient to counter Chess's allegation by trying to circumvent having to show that it did in fact comply with the directive.  *See Parrott*, 536 F.3d at 634-35 (finding that "it is the Government's burden to assert [the discretionary function exception] if and when it seeks to defeat a claim

11

because of [it]"); *see also William v. Fleming*, 597 F.3d 820, 824
(7th Cir. 2010) (taking the position that "the proper inquiry is
not one of jurisdiction, but whether the United States has a
defense to suit"). The government has failed to show that it
complied with P.S. 5290 and that, as a matter of law, its actions
fall under the discretionary function exception. *See Berkovitz
by Berkovitz v. United States*, 486 U.S. 531, 542-43, 108 S.Ct.
1954, 100 L.Ed.2d 531 (1988) (finding that the exception did not
apply where defendant did not comply with a statutorily mandated
prerequisite to issuing a license to a vaccine manufacturer);
*Alfrey v. United States*, 276 F.3d 557, 562 (9th Cir. 2002)
(finding issues of material fact existed where plaintiff argued
that defendant had not completed a mandatory component of the
cell-assignment process).

Chess further alleges that the Government failed to comply
with certain directives aimed at monitoring federal prisoners
suffering from mental illness. According to Chess, there are
three relevant components to the directives regulating the
monitoring of prisoners with a mental illness. First, P.S.
5310.13(9) requires that the BOP Program Coordinator meet with
certain mentally ill inmates on a monthly basis to assess
treatment compliance. These monthly assessments, however, are
only required for an inmate "placed in a special housing
assignment for mental health reasons, deemed to need special

12

attention as a result of a *significant mental impairment*, or *receiving psychoactive medication for a significant psychiatric problem* (for example, psychosis, severe depression, or *bipolar disorder*)." P.S. 5310.13(9) (emphasis added). Defendants do not address the issue of whether Adams fit into any of these categories, but the record shows that he had been diagnosed with Schizoaffective disorder, Bipolar type and that he had been prescribed antipsychotic medication. Taken in the light most favorable to Chess, the facts show that Adams would have been covered by P.S. 5310.13(9).

Further, assuming the directive applied to Adams, the language of the directive indicates that these monthly meetings were non-discretionary. Defendant responds that "the record is replete with evidence" showing adequate monitoring, but the evidence shows no documented meeting from December 23, 2006 up to the attack on February 6, 2007. One of the stated purposes of the monthly meetings is to ensure treatment compliance, and Chess argues that Adams was not compliant with his treatment. Defendant, though, has submitted evidence showing that Adams was, in fact, complying with the treatment plan. Chess has not disputed that evidence with properly supported facts. The monthly meetings are also held "to assess [the inmate's] level of functioning and need for changes in treatment strategy." P.S. 5310.13(9). The record indicates that BOP staff adjusted Adams'

13

treatment a number of times prior to the last documented meeting on December 23, 2006, suggesting that his treatment needs were, at times, in flux.  By failing to show that Adams was exempt from the requirement of monthly meetings, the Government has not shown that there is no disputed fact as to whether it is entitled to the discretionary function exception on Chess's claims arising from a failure to monitor Adams on a monthly basis.

The second component of the directive that Chess contends regulated the BOP's course of action regarding Adams simply allows the Program Coordinator to recommend changes in housing, work, and program assignments for mentally ill inmates.  P.S. 5310.13(10).  The language of the program statement is suggestive, and indicates that Program Coordinators were to have discretion in making recommendations.  Of course, non-compliance with other, mandatory, portions of the directive might poorly equip a Program Coordinator to make any recommendations, but the language of this particular section is a grant of discretion to the Program Coordinator.  The mandatory language stating that the Program Coordinator "shall serve as the institution's contact person" merely supports the Government's position that the housing and program assignments, even for mentally ill inmates, are discretionary and are to be made in consultation with BOP officials who are concerned with public policy issues.

14

The last component of P.S. 5310.13 with which Chess argues the Government failed to comply requires further monitoring of mentally ill inmates and consultation among BOP staff.  P.S. 5310.13(12) requires regular, "at least quarterly, but preferably monthly," case consultation meetings among certain BOP staff regarding mentally ill inmates.  Treatment recommendations that result from these meetings are to be documented.  Further, this section requires that the Program Coordinator make monthly notes on any mentally ill patient who is "receiving psychoactive medication for a significant psychiatric problem," "involved in a current treatment or special housing program," or "returned within the last six months from a psychiatric treatment facility after completion of treatment for a significant psychiatric impairment."  As discussed above, there was an absence of any documentation by BOP staff regarding Adams' mental illness or treatment from December 23, 2006 until after the attack on Chess. And, again, the Government has not asserted, nor submitted evidence showing, that Adams was exempt from these requirements. Therefore, as with section 9 of P.S. 5310.13, the Government has not shown that the discretionary function exception protects it from Chess's claims arising from a failure to monitor Adams as required in section 12 of the directive.

Chess also seems to argue that BOP officials had a duty to "clear" Adams to reenter the general population after he had been

15

placed in the SHU. However, Chess points to no statute,
regulation, or directive to support his claim that the BOP had a
duty to "enforce its own classification decision" by documenting
its process for shifting Adams from the SHU back to the general
population. In fact, former Associate Warden Janet Perdue
testified in detail about the procedures at the MCC for
transferring inmates out of administrative detention in the SHU
and back into the general population. Perdue explained that MCC
staff held weekly segregation meetings where they discussed each
inmate housed in the SHU for non-disciplinary reasons, and that
during these meetings staff made a determination about whether it
was appropriate to transfer an inmate back to the general
population. Perdue also explained that no formal documentation
was generated as a result of these meetings, nor was any required
by any policy or procedure. Chess does not dispute Purdue's
testimony on this point. This is the type of decision-making
process that the discretionary function exception is intended to
protect. First, the decision to return an inmate to the general
population from administrative detention involves "an element of
judgment and choice" and is not constrained by any statute or
policy. Further, given the breadth of the staff who attended
these weekly meetings—everyone from the warden and associate
wardens to representatives from the psychology department—it is
clear that the decision to move an inmate from the SHU back to

16

the general population is based on public policy considerations, such as costs to the institution, constraints on space, and the orderly functioning of the MCC.

Finally, Chess argues that the discretionary function exception does not apply to Officer DePaul's conduct on February 6, 2007, the day Adams attacked Chess. Specifically, Chess alleges that DePaul failed to take action after Adams' cell mate told DePaul of Adams' strange behavior and requested to change cells, and that DePaul violated BOP regulations by reading a newspaper and packing up his belongings during his shift. As to the first allegation, the Seventh Circuit has made clear that the relevant regulations have vested discretion in BOP officials to determine how to respond to threats and when or if disciplinary action is required. *Calderon*, 123 F.3d at 949-50 (citing 28 C.F.R. § 541).

The second allegation, that DePaul was not performing his duties right before the attack, is a closer call. The Government has admitted that BOP regulations prohibit a correctional officer from reading a newspaper while on duty. However, the Government contends that DePaul did not violate BOP regulations when he began to put his personal belongings in his bag prior to lock-down and the end of his shift. Chess points to no BOP regulation or program statement prohibiting DePaul's actions or specifying the lockup routine to be followed. Chess relies solely on the

17

deposition testimony of Lieutenant Cleveland Swan, but the line of questioning asks for Lieutenant Swan's subjective opinion about what officers are allowed to do, not what the BOP regulations require. Without any mandatory regulation, I assume that officers are allowed a certain amount of discretion in how they decide to implement the lockup routine.

However, I find that DePaul's actions fail at the second prong of the discretionary function test. The decision to pack up one's belongings prior to the end of a shift is not based on public policy and is not subject to policy analysis. While day-to-day decisions are often protected by the discretionary function exception, the decision to pack up while still on duty, even if discretionary, is based on personal interest. *See Palay*, 349 F.3d at 432 ("Perhaps the corrections officer monitoring the ... unit at the time ... was simply asleep ... [o]r perhaps he left the unit unattended in order to enjoy a cigarette or a snack. That type of carelessness would not be covered by the discretionary function exception as it involves no element of choice or judgment grounded in public policy considerations."). Therefore, Chess's claims relating to DePaul's alleged failure to monitor inmates during lockup are not barred by the discretionary function exception.

B. Negligence Under the FTCA

18

The Government argues that even if the discretionary function exception does not bar all of Chess's claims, there is no genuine dispute as to any material fact that would allow Chess to recover under the FTCA. Chess, on the other hand, argues that he is entitled to judgment in his favor as a matter of law.

The FTCA requires a plaintiff to show that the defendant is liable in tort under the applicable state law. 28 U.S.C. § 1346. In an action for negligence under Illinois law, a plaintiff must show "that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *First Springfield Bank & Trust v. Galman*, 188 Ill.2d 252, 256, 720 N.E.2d 1068, 242 Ill.Dec. 113 (Ill. 1999). Proximate cause, under Illinois law, may be cause in fact or legal cause. *Palay*, 349 F.3d at 432 (citing *Evans v. Shannon*, 201 Ill.2d 424, 267 Ill.Dec. 533, 776 N.E.2d 1184, 1190 (Ill. 2002)). Cause in fact requires that the injury would not have occurred absent defendant's conduct, and legal cause is a question of foreseeability. *Id*. Claims involving a failure to protect require a plaintiff to show that the defendant "knew or reasonably should have known" of a potential problem with an inmate. *Parrott*, 536 F.3d at 637 (citing *Brown v. United States*, 486 F.2d 284, 288-89 (8th Cir. 1973)). In the context of summary judgment, "[w]hether or not the defendant's conduct proximately caused the plaintiff's injury

19

ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay*, 349 F.3d at 432-33.

Chess argues that because the BOP failed to adhere to the regulations and program statements discussed above, the BOP has violated its duty of care under § 4042. Indeed, the Supreme Court has recognized that § 4042 describes a "duty of care owed by the [BOP] to federal prisoners." *United States v. Muniz*, 374 U.S. 150, 164-65, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *see also Parrott*, 536 F.3d at 636-37. However, as stated above, the discretionary function exception necessarily limits Chess's allowable claims under § 4042. In light of the discussion above, then, in order to proceed, Chess must show there is an issue for trial as to (1) whether the Government, in failing to comply with certain BOP regulations and program statements, breached its duty to protect Chess such that it knew or reasonably should have known that Adams should have been segregated from the general population, and that Adams' placement in the general population proximately caused Chess's injuries; and (2) whether DePaul negligently failed to monitor Unit 13 on the night of the attack in breach of the duty to protect, and that such negligence proximately caused Chess's injuries.

Although I concluded that there is a genuine dispute of material fact as to whether BOP officials complied with

20

requirements to review Adams' Inmate Central File upon intake and
to review Adams' mental health on a monthly basis, Chess has
failed to allege or present any admissible evidence tending to
show that there was information in the Inmate Central File, if
the file was even available, that would indicate Adams was
unsuitable for placement in the general population upon intake at
the MCC in September 2006.  Therefore, Chess has failed to raise
an issue for trial as to whether the BOP's failure to review
Adams' Inmate Central File proximately caused Chess's injury.

    While Chess may not proceed on his claim that the BOP
negligently placed Adams in Unit 13 when he was returned to the
MCC in September of 2006, I find that Chess has raised an issue
for trial as to whether, after December 23, 2006, BOP officials
knew or reasonably should have known that Adams should have been
segregated from the general population.  As explained above,
there is a genuine dispute as to whether Adams' psychological
treatment and needs were properly monitored after his meeting
with Dr. Greenstein on December 23, 2006.  Taken in the light
most favorable to Chess, the facts show that BOP officials failed
to monitor Adams, Adams had recently been in the SHU for
protection of inmate and staff, and there had been changes to his
medication in the months prior to his placement in the SHU in
December 2006.  A fact finder could conclude that a failure to
properly monitor Adams, as required by the BOP program statement,

proximately caused Chess's injury in that such an attack should
have been foreseeable by defendants.  However, while Chess has
survived summary judgment on this issue, he is not entitled to
summary judgment.  Chess has not presented enough evidence to
show that, as a matter of law, a breach proximately caused his
injuries.  This is a question for the finder of fact.

Finally, I also find that there are triable issues as to
whether DePaul's alleged failure to monitor the unit at the time
of the attack constituted negligence and proximately caused
Chess's injuries.  Chess has shown that DePaul was packing his
personal belongings right before the attack and reading a
newspaper shortly before that.  Chess has, therefore, raised at
least one issue for the finder of fact regarding his claim that
DePaul negligently failed to monitor the unit.  Again, while this
claim survives summary judgment, Chess has not shown that he is
entitled to summary judgment.

III.

For the foregoing reasons, plaintiff's motion for summary
judgment is denied and defendant's motion for summary judgment is
granted in part and denied in part.  To summarize, plaintiff may
proceed on his claims that under the FTCA, the government
negligently failed to monitor Adams' psychological condition

22

after December 23, 2006 and negligently failed to monitor Unit 13
on the night of the attack.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: December 1, 2011